**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **RENAISSANCE GREETING CARDS, INC.** | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 1:05cv341** |
| | ) | |
| **DOLLAR TREE STORES, INC.** | ) | |
| | ) | |
| Defendant. | ) | |

FILED
DEC 19 2005
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## MEMORANDUM OPINION

In this suit, an owner of three registered trademarks sues a large discount retailer for trademark infringement and unfair competition under both the Federal Trademark Act of July 5, 1946, 15 U.S.C. § 1051, *et seq.*, as amended, and Virginia common law. More particularly, plaintiff Renaissance Greeting Cards, Inc. ("RGC"), a marketer of greeting cards and the owner of three registered trademarks employing the words RENAISSANCE and RENAISSANCE GREETING CARDS for its line of greeting cards, brings this federal trademark infringement and state unfair competition action against the defendant, Dollar Tree Stores, Inc. ("Dollar Tree"), for using the word RENAISSANCE in marketing its own line of gift bags, and to a lesser degree for use in the marketing of gift wraps, bows, boxes, tissue paper and ribbon. At issue is whether RGC's RENAISSANCE trademark is so well-recognized by consumers of greeting cards (that is, strong) that Dollar Tree's use for non-competitive products is likely to cause confusion among consumers.

88

**I.**[1]

Plaintiff RGC is a Maine Corporation engaged in the business of creating and marketing specialty greeting cards.  RGC is a wholly owned subsidiary of Florists' Transworld Delivery, Inc. ("FTD").  In August 1992, RGC registered with the Patent and Trademark Office ("PTO") a trademark employing the word RENAISSANCE in stylized form,[2] and a trademark using the phrase RENAISSANCE GREETING CARDS in a similarly stylized form.[3]  In 1996, RGC restyled the lettering of the 1992 trademarks slightly and continues using this restyled lettering today.[4]  In October 2003, RGC registered a third trademark for the word RENAISSANCE in typed form.[5]  RGC and its predecessors have used these marks for greeting cards continuously since 1977.  The parties agree that RGC's RENAISSANCE mark is incontestable as applied to greeting cards pursuant to 15 U.S.C. §§ 1065 and 1115(b).[6]

---

[1] The facts recited here are largely undisputed.  Where disputes exist, they are noted and, if material, the facts are construed favorably to the non-moving party, as required.  *See Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[2] This mark was filed on August 12, 1992 and issued on July 12, 1994.  Its registration number is 1,844,359.  See Exhibit A, RGC Mark #1.

[3] This mark was filed on August 12, 1992 and issued on July 12, 1994.  Its registration number is 1,844, 357.  See Exhibit A, RGC Mark #3.

[4] See Exhibit A, RGC Mark #2 and #4.

[5] This mark was filed on October 22, 2003 and issued on March 29, 2005.  Its registration number is 2,936,155.

[6] A registered mark is deemed incontestable pursuant to 15 U.S.C. § 1065 if: (1) it has been in continuous use for five years from the date of its initial registration, (2) there have been no adverse determinations regarding its right to register the mark, (3) there are no pending proceedings in the PTO regarding its rights under the mark, (4) an affidavit has been filed confirming that the goods have been in continuous use under the mark, (5) and that the mark is not generic.  15 U.S.C. § 1065.  Once a mark has become incontestable, "the registration shall be

The word RENAISSANCE is a very commonly-used mark for a wide variety of goods and services, both within industries arguably related to greeting cards and in the economy in general. For example, RGC's marks are registered in PTO International Class 16, which covers paper and printed goods.[7]  In this class, there are currently, apart from RGC's marks, 20 active registrations or applications for marks using the word RENAISSANCE.  These registrations are for a variety of paper products including: labels, wedding albums, periodicals and various paper goods.  Among all classes of products, there are presently 465 active federal and 203 state trademark registrations or pending applications for marks containing the word RENAISSANCE.  These hundreds of marks represent a diverse array of industries, including: the hotel industry, the information technology industry, executive education services, and costume jewelry.  Indeed, it appears that included among these many marks is a mark used in connection with greeting cards.  A registered trademark of CLASSIC GREETINGS.COM: HOME PORT OF THE WWW RENAISSANCE,[8] is registered for "entertainment services, namely, providing information on art, music, and poetry in the field of

_____

conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce . . . . in connection with the goods or services specified in the affidavit . . . ."  15 U.S.C. § 115(b).

   [7]  *See* 37 C.F.R. § 6.1. The regulation lists the following as covered by Class 16 in the international schedule of classes of goods and services:

> Paper, cardboard and goods made from these materials, not included in other classes; printed matter; bookbinding material; photographs; stationery; adhesives for stationery or household purposes; artists' materials; paint brushes; typewriters and office requisites (except furniture); instructional and teaching material (except apparatus); plastic materials for packaging (not included in other classes); playing cards; printers' type; printing blocks.

   [8]  This trademark, Registration number 2,415,517, was among those included in Dollar Tree's summary judgment submissions.

classical art and literature via the global computer network," but visitors to the website www.classicgreetings.com are also offered "free classic greetings and poetry cards."[9]  In addition, there are 245 identifiable "common law trademarks" using the word RENAISSANCE and at least 2,925 businesses using the word RENAISSANCE in their business names.  Thus, the word RENAISSANCE is widely used by companies selling a variety of products, some related to, and many distinct from, greeting cards.

In an effort to protect its trademark, RGC has initiated one cancellation proceeding and three opposition proceedings at the PTO against parties who had registered or were seeking to register marks containing the word RENAISSANCE.  In August 2004, RGC formally opposed registration of the mark RENAISSANCE LABEL by Renaissance Mark, Inc. for its line of Printed labels.  The parties reached a settlement restricting the types of labels Renaissance Mark, Inc. may offer under the RENAISSANCE mark.  In October 2001, RGC opposed registration of the mark RENAISSANCE by Album X Corporation for its line of wedding and photo albums.  This dispute was settled by an agreement that Album X Corporation would not market its albums in department stores, while allowing Album X to continue to market its albums elsewhere under the RENAISSANCE mark.  In September 1992, RGC opposed Renaissance of Thought, Inc.'s registration of the mark RENAISSANCE OF THOUGHT, INC.  The merits of the opposition were not adjudicated, as the other party voluntarily abandoned the application.  Finally, in April 1993, RGC petitioned for the cancellation of the registered mark of RENAISSANCE held by Argo

---

[9] This web site information is appropriate for judicial notice pursuant to Rule 201, Fed. R. Evid. *See, e.g., Wang v. Pataki*, ___ F.Supp.2d ___, 2005 WL 276562, *10 n.2 (S.D.N.Y. 2005) (taking judicial notice of the contents of a website) (citing *Hotel Employees & Rest. Employees Union, Local 100 v. New York Dep't of Parks & Recreaion*, 311 F.3d 534, 549 (2d Cir.2002)).

Wiggins S.A.  RGC withdrew its petition in 1994 and the registration was cancelled shortly thereafter under Section 8 of the Lanham Act, which requires the PTO to cancel a registration after six years if the mark is no longer in use.  15 U.S.C. § 1058(a). In addition, counsel for RGC corresponded with three other parties using or intending to use the RENAISSANCE mark in a conflicting manner, which resulted in the cessation of the conflicting use.

RGC's sales constitute a very small portion of the overall domestic greeting cards market. Over the past five years RGC has had average annual sales of $12 million.  By comparison, the retail greeting cards market is valued at roughly $7 billion annually.  In the three year period prior to 1993, RGC's sales averaged just $7.7 million annually.  The vast majority of RGC's sales are made not directly to consumers, but through its sales representatives and sales force to various retailers and to florists affiliated with FTD.  The distribution among these outlets, based on the percentages of RGC's sales, is as follows: 18% for pharmacies; 16% for florists; 15% for grocery stores; 13% for card and gift shops; 12% for hospital gift shops; and 26% for other retail outlets including bookstores, convenience stores, department stores, hardware stores, hotel lobby stores, mail box stores, newsstands, party goods stores, office supply stores and the like.

With the exception of local advertising in support of its retail outlet store in Maine, RGC does not advertise its products directly to retail consumers, but instead advertises exclusively in trade publications and at trade shows.  Most of RGC's advertising efforts, therefore, are directed at its wholesale customers.  Over the past five years, RGC has expended an average of $358,000 annually on advertising.  In the three years prior to 1993, RGC expended an average of approximately $230,000 annually on advertising.  RGC has not provided any survey evidence on the brand recognition of its RENAISSANCE trademark.

Greeting cards are sometimes marketed under the same trademark as gift bags or gift wrap, or both. Several of RGC's competitors have marketed these items under the same trademark including: Paramount Cards, Marian Heath, Marcel Schurman, Recycled Paper Greetings, Hallmark and the Carlton division of American Greetings. Indeed, RGC marketed its own line of gift bags, gift wrap, bows and ribbon under the "Renaissance" trademark during the 1980s, but it ceased doing so in 1990 and has not done so since.

Defendant Dollar Tree is a large national retailer operating approximately 2,845 stores in all 48 contiguous states of the continental United States. For the year that ended January 29, 2005, Dollar Tree's net sales totaled $3.126 billion. Its net income for the same period was $180.250 million.[10] Dollar Tree has used the RENAISSANCE mark on its line of gift bags since 1993, and on its line of gift wrap, boxes, bows, ribbon and tissue since 2002. Examples of Dollar Tree's use of the mark RENAISSANCE on its products are attached hereto as Exhibit A. Dollar Tree developed its marks without knowledge of RGC's marks. Dollar Tree chose the RENAISSANCE mark for its line of gift bags because it "symbolize[d] high quality and fanciness to enhance the perceived value of the gift." Edney Declaration ¶ 5. Dollar Tree has provided different estimates as to how many gift bags it has sold. These estimates range from approximately 250 million to approximately 500 million units of gift bags, gift wrap, bows, etc., on which the RENAISSANCE mark has appeared since 1995. In addition to selling gift bags, Dollar Tree markets greeting cards

---

[10] It is appropriate to take judicial notice of SEC filings at the summary judgment stage. Rule 201(c) Fed. R. Evid.; *See, e.g., In re Delmarva Securities Litigation,* 794 F.Supp. 1293, 1299 (D.Del. 1992) ("SEC filings fall within th[e] category of public records that can be judicially noticed.").

under the TENDER THOUGHTS trademark of its supplier, American Greetings Corporation.

Dollar Tree did not conduct a trademark search or obtain opinion of counsel prior to its initial use of the RENAISSANCE mark in 1993, nor did it do so before using the mark on its gift wrap products in 2002. During the latter half of 2003, Dollar Tree performed searches on various marks that it used, and discovered that the mark RENAISSANCE was used by many different companies. In light of this discovery, it considered abandoning use of the RENAISSANCE mark, and ultimately did so in May 2004 when it began marketing its line of gift bags, gift wrap, etc. under the mark VOILA. Despite this abandonment, some gift bags bearing Dollar Tree's RENAISSANCE mark made prior to May 2004 remained in stock and available for purchase as late as July 2005.

Despite the very large volume of bags bearing the RENAISSANCE mark sold by Dollar Tree beginning in the early 1990s, RGC did not discover Dollar Tree's use of the mark on its line of gift bags until 2003. As a result of this discovery, RGC sent a letter to Betta Products, Inc. ("BPI"), the apparent manufacturer of the gift bags bearing the allegedly infringing mark. BPI responded by directing RGC to Dollar Tree, at whose direction they were using the RENAISSANCE mark. Counsel for RGC wrote Dollar Tree in December 2003 raising the possibility that Dollar Tree's use of the RENAISSANCE mark on its gift bags might violate trademark and unfair competition laws, and seeking to discuss the matter with Dollar Tree's intellectual property counsel. This letter had not yet been responded to as of February, 27 2004, when counsel for RGC sent Dollar Tree a second letter seeking to discuss the matter with Dollar Tree's intellectual property counsel. Employees of Dollar Tree referred RGC to its intellectual property counsel, who RGC contacted by letter on June 25, 2004. No response to this letter was

ever received by RGC.

After the initiation of this lawsuit, RGC solicited instances of actual confusion from its sales force. As a result, RGC has identified three wholesale customers who manage retail outlets that buy greeting cards and who claim to have been confused by Dollar Tree's use of the word RENAISSANCE on its gift bags. Thus, Lena Depp, the owner of Lena's Card & Gift Shoppe in Frankfort, Kentucky and a customer of RGC for approximately ten years, claims that "the similarities in the name and lettering style" led her to believe that a gift bag purchased at Dollar Tree on which the words "Renaissance Gift Bags" appeared was connected to RGC. As a result, she asked the sales representative of RGC from whom she purchased greeting cards to sell her the gift bags for resale in her shop. Similarly, Tiffany Pope Jones, the manager and buyer for Raley Pharmacy in Catoosa, Oklahoma and a customer of RGC, believed that a gift bag she received was sold by RGC when, in fact, it was sold by Dollar Tree. A similar instance of confusion was reported by a store manager in Indiana. Finally, an independent sales representative in Florida, who sells RGC cards was confused after seeing a Dollar Tree gift bag with the name RENAISSANCE on it. RGC has not identified any instances of actual confusion among the retail consumers of its gift cards, nor have they conducted a survey of those customers to determine whether they have been confused by Dollar Tree's use of its RENAISSANCE on its line of gift bags or whether they would be likely to be confused.

RGC brought this suit on March 29, 2005, and the second amended complaint includes three claims: (i) infringement of a federally registered trademark as prohibited by 29 U.S.C. § 1114(1); (ii) trademark infringement and a false designation of origin as prohibited by 29 U.S.C. § 1125(a); and (iii) common law infringement and unfair competition under Virginia state

law.  The parties, recognizing that the material facts in this case are largely undisputed, have filed cross-motions for summary judgment pursuant to Rule 56(c), Fed. R. Civ. P.  These motions have been fully briefed and argued, and are now ripe for disposition.

## II.

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  A genuine issue of material fact exists where there is evidence, viewed in the light most favorable to the non-moving party, such that a reasonable jury could find in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The opposing party "may not rest upon the mere allegations or denials of [its] pleadings," but instead must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).  When considering cross-motions for summary judgment, each motion should be evaluated separately using the standard set forth above.  *See ITCO Corp. v. Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 45 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment--even where, as below, both parties have filed cross motions for summary judgment.").

## III.

A trademark infringement case involves a two part inquiry: (1) whether the plaintiff has a valid, enforceable trademark, which will therefore be deemed eligible for protection, and, if so, (2) whether the defendant's use of an identical or similar mark is "likely to cause confusion" in

the marketplace.[11]  These principles govern RGC's two federal claims.  And, because there is

essentially no dispute that RGC's marks are valid and enforceable, the principal battleground for

both claims is the presence or absence of a likelihood of confusion among consumers stemming

from Dollar Tree's use of its RENAISSANCE mark on paper products other than greeting cards.

     Because the test for a claim of common law infringement and unfair competition under

Virginia law likewise focuses on the likelihood of confusion among consumers, this claim need

not be analyzed separately.[12]  In any trademark infringement case, state or federal, the goals of

trademark protection, which include protecting product identification, providing consumer

information, and encouraging the production of quality goods, must be balanced by the concern

that trademark protection not become a means of monopolizing language or stifling productive

competition.  *See Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005); *see also* J. Thomas

McCarthy, McCarthy on Trademarks and Unfair Competition § 2.2 (2005) (hereinafter McCarthy

on Trademarks).


**The Validity of RGC's Marks**

     As a threshold matter, it is necessary to determine whether RGC's RENAISSANCE

---

    [11] *See* 15 U.S.C. §§ 1114(1), 1125(a); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 933 (4th Cir. 1995) ("[T]he Lanham Act establishes a two prong test that Plaintiffs must satisfy in order to obtain an injunction for trademark infringement and unfair competition.  In addition to proving the mark's protectibility, a complainant must demonstrate that the defendant's use of the colorable imitation is likely to cause confusion among customers."); *Perini Corp. v. Perini Constr.*, 915 F.2d 121, 124 (4th Cir. 1990) (same).

    [12] *See Lamparello v. Fallwell,* 420 F.3d 309, 312 n.1 (4th Cir. 2005); *Lone Star Steakhouse & Saloon*, 43 F.3d at 930 n.10 (citing *Food Fair Stores, Inc. v. Lakeland Grocery Corp.*, 301 F.2d 156, 160 (4th Cir.1962)); *Teaching Co. Ltd. Partnership v. Unapix Entertainment, Inc.*, 87 F.Supp.2d 567, 575 (E.D.Va. 2000).

trademark is valid, and therefore entitled to protection.[13]  A mark will not be entitled to

protection unless it has acquired a sufficient level of distinctiveness, that is, whether "is serves

the traditional trademark functions of 'distinguishing the applicant's goods from those of others'

and identifying the source of the goods."  *Retail Services, Inc. v. Freebies Publishing*, 364 F.3d

535, 538 (4th Cir. 2004) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768

(1992)).  A trademark can gain distinctiveness based on either the word's inherent quality, or the

meaning that the word has gained through exposure to the market.  *See Id.* at 538-39.  Based on

the mark's inherent qualities, courts categorize marks into one of four classifications along a

spectrum of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; and (4)

arbitrary or fanciful.  *See Lone Star*, 43 F.3d at 933.

      At the most distinctive end of the spectrum are arbitrary or fanciful marks, such as

KODAK or XEROX, which are meaningless outside of the product they brand and therefore

entitled to the strongest form of protection.  *See Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d

455, 464 (4th Cir. 1996).  At the least distinctive end of the spectrum are generic marks, which

simply "convey[] information with respect to the nature and class of the article," and are

therefore, never entitled to trademark protection.  *Washington Speakers Bureau, Inc. v. Leading

Authorities, Inc.*, 33 F.Supp.2d 488, 495 (E.D.Va. 1999).  In between these two poles are

suggestive and descriptive marks.  Suggestive marks, such as COPPERTONE, or PLAYBOY,

are "meant to project a favorable or idealistic image with which a prospective user might

---

[13] As noted, there is essentially no dispute that RGC's mark is valid and enforceable in the greeting card market.  Even so, the analysis here of the nature of RGC's mark is essential to an assessment of the strength of RGC's mark and hence relevant to the analysis of the likelihood of confusion question.

identify" but do not suggest a particular product or service. *Sara Lee*, 81 F.3d at 464.

Descriptive marks, such as AFTER-TAN post tanning lotion, or 5 MINUTE GLUE, "merely

describe a function, use, characteristic, size, or intended purpose of the product," and are entitled

to protection only if they have developed "secondary meaning" in the marketplace such that

consumers have come to associate the mark with that particular product. *Id.* (citing COCA-

COLA as the paradigmatic example of a descriptive mark that has acquired secondary meaning)

Because the term RENAISSANCE does not describe any particular characteristic of

RGC's greeting cards, but "requires some imagination to connect it with the goods," it is

suggestive, and therefore entitled to protection. *Freebies*, 364 F.3d at 539.  The mark's

registration by the PTO without evidence of its secondary meaning further supports the

conclusion that the mark is suggestive. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1528-29

(4th Cir. 1984).  Indeed, RGC's marks have become incontestible and therefore, their validity

may not be challenged.  15 U.S.C. § 1115(a).

The conclusion that RGC's mark is incontestable, is merely necessary, but not sufficient

to a finding of infringement.  While the Supreme Court has made clear in *Park 'N Fly, Inc. v.*

*Dollar Park & Fly, Inc.*, 469 U.S. 189 (1985), that the validity of an incontestably registered

mark cannot be challenged, Dollar Tree is free to argue that the mark is not strong and therefore

use in related but different markets is not likely to cause confusion among consumers. *See Petro*

*Stopping Centers L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 92 (4th Cir. 1997).   Thus,

the Fourth Circuit has stated:

> [I]ncontestability affects the validity of the trademark but does not establish the
> likelihood of confusion necessary to warrant protection from infringement.
> Likelihood of consumer confusion remains an independent requirement for

> trademark infringement . . . .[We] hold that we are free to address whether
> Plaintiffs' incontestable trademark is descriptive or suggestive in determining
> whether the likelihood of consumer confusion exists in this case.

*Lone Star*, 43 F.3d at 935; *see also* McCarthy on Trademarks §§ 11:84, 32:155.  To find

infringement, RGC still has the burden of establishing by a preponderance of the evidence that

the use of RENAISSANCE by Dollar Tree is likely to cause confusion.


**Likelihood of Confusion**

 The Fourth Circuit has highlighted the following seven factors to be considered when

determining whether the use of a similar trademark has resulted in the likelihood of confusion:

   (i)     the strength or distinctiveness of the mark;

   (ii)    the similarity of the two marks;

   (iii)   the similarity of the goods/services the marks identify;

   (iv)    the similarity of the facilities the two parties use in their business;

   (v)     the similarity of the advertising used by the two parties;

   (vi)    the defendant's intent; and

   (vii)   actual confusion.

*Pizzeria Uno*, 747 F.2d at 1527.   These factors constitute an approximate guide, not a rigid

formula, and the relevance or relative weight of any of these factors may vary depending on the

circumstances of a given case.  *Id.; Sara Lee*, 81 F.3d at 463.

 Although the likelihood of confusion is a "factual issue dependent on the circumstances

of each case," summary judgment is appropriate when the undisputed material facts that underlay

the inquiry clearly demonstrate a likelihood of confusion.  *Resorts of Pinehurst, Inc. v. Pinehurst*

*Nat. Corp.*, 148 F.3d 417, 422 (4th Cir. 1998).  Summary judgment is especially appropriate where, as here, the parties have agreed on a bench trial and submitted a "voluminous record to the court for dispositive decision at the time of the summary judgment motions." *International Bancorp, LLC v. Societe des Bains Mer et du Cercles des Estrangers a Monaco*, 329 F.3d 359, 362 (4th Cir. 2003), *cert. denied,* 540 U.S. 1106 (2004); *see* August 19, 2005 Transcript, at 41 (The Court: "All right.  I don't need anything more.  After that, the case is ready for disposition, isn't it, Mr. Hanes [Attorney for Dollar Tree], Mr. Culver [Attorney for RGC]."  Attorney for Dollar Tree: "Yes."  Attorney for RGC: "Yes.").  The Fourth Circuit recognizes, therefore, that

> It makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, unless those inferences involve issues of witness credibility or disputed material facts.  If a trial on the merits will not enhance the court's ability to draw inferences and conclusions, then a district judge properly should draw his inferences without resort to the expense of trial.

*International Bancorp*, 329 F.3d at 362 (quoting *Matter of Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991)).  Thus, if, based on the undisputed facts in the summary judgment record, no reasonable jury could find a likelihood of confusion, summary judgment is appropriate.

*(i) The Strength or Distinctiveness of the Mark*

The Fourth Circuit has emphasized that the strength or distinctiveness of the mark is the "paramount factor" in determining likelihood of confusion.  *Pizzeria Uno*, 747 F.2d at 1527. *See also Lone Star*, 43 F.3d at 933; *Sara Lee,* 81 F.3d at 467 (describing the strength of the mark as the "alpha of infringement analysis").  In evaluating the strength of a mark, it is useful to consider two separate categories of a mark's strength: (1) conceptual strength: the placement of the mark along a spectrum focusing on the inherent potential distinctiveness of the term; and

(2) commercial strength: the marketplace's recognition as of the time the mark is asserted in

litigation.[14]   Of these two considerations, the second is more important, because a conceptually

weak but commercially strong mark can still gain protection through secondary meaning, as

illustrated by such examples as AMERICAN Airlines, PAYLESS Drug Stores and KENTUCKY

FRIED CHICKEN.  *See* McCarthy on Trademarks § 11:83.  On the other hand, a conceptually

strong mark that is relatively unknown in the marketplace will not be likely to cause any

confusion among consumers of other products. *Id.*  To afford protection to marks simply on the

basis of their conceptual distinctiveness would be contrary to the ultimate inquiry under this

factor, namely, "the degree to which the designation is associated by prospective purchasers with

a particular source."  *Petro Stopping*, 130 F.3d at 93 (quoting *Estee Lauder, Inc. v. The Gap, Inc.*,

108 F.3d 1503, 1510 (2d Cir. 1997)).

Normally, the fact that the PTO has registered the trademark is persuasive evidence of a

mark's conceptual strength because the PTO registers only fanciful, arbitrary or suggestive

marks, or descriptive marks shown to have acquired secondary meaning.  *Lone Star*, 43 F.3d at

934.  Indeed, as described above, the word RENAISSANCE is "suggestive" as that term has been

defined.  However, the categories of distinctiveness are only a rough measure of the mark's

---

[14] *See* McCarthy on Trademarks § 11:83; *see also A.C. Legg Packing Co., Inc. v. Olde
Plantation Spice Co., Inc.*, 61 F.Supp.2d 426, 430 (D.Md. 1999); *World Gym Licensing, Ltd. v.
Fitness World, Inc.*, 47 F.Supp.2d 614, 621-22 (D.Md. 1999); *Sun Banks of Florida, Inc. v. Sun
Federal Sav. & Loan, Assoc.*, 651 F.2d 311, 315 (5th Cir. 1981) (strength is a factor of both the
inherent quality of the mark and its "standing in the marketplace."); *GoTo.com, Inc. v. Walt
Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000) ("This 'strength' of the trademark is evaluated
in terms of its conceptual strength and commercial strength.").  Though the Fourth Circuit has
not expressly adopted this framework, it has done so in effect.  *See Petro Stopping*, 130 F.3d at
93 ("Thus, courts must examine, in addition to the mark's characterization as suggestive or
descriptive, the extent of secondary meaning a mark has acquired in the eyes of consumers.").

conceptual distinctiveness.  *See Washington Speakers*, 33 F.Supp.2d at 494.

The categorization of marks as either generic, descriptive, suggestive, or arbitrary or fanciful is premised on the common sense notion that the less descriptive a mark is of the product, the more likely it is that the mark is distinctive with respect to the product.  Yet, this may not always be true, as some words that do not describe any particular product, but have some attractive connotation, become so commonly-used as to diminish their ability to distinguish one product from another.  This phenomenon was recognized by the Fourth Circuit as long ago as 1941, in a dispute between a whiskey distiller and a beer brewer, both users of the trademark ARROW for their products.  *Arrow Distilleries, Inc. v. Globe Brewing Co.*, 117 F.2d 347, 349 (4th Cir. 1941).  There, the Fourth Circuit described the relevance of this phenomenon to the trademark infringement analysis in the following terms:

> The crucial issue in this case is whether the word 'Arrow' is a word of such distinctive character, when adopted as a trade-mark for one kind of intoxicating liquors, that it cannot be used on any other kind without creating the belief that both spring from a common source; or, on the other hand, is a word like 'Standard,' or 'Gold Medal,' or 'Blue Ribbon,' which has been adopted by so many persons as a trade-mark for articles of divers kind that it does not signify the goods of any one user.  The question is important because, in determining the extent of the field of exclusive occupation, a name in the first class is accorded liberal treatment in the laws of trade-marks, while a name in the second class is narrowly restricted to the particular kind of goods for which it is used by its owner.

*Id.*  Given this and because ARROW was commonly used as a trademark, the court found that ARROW belonged to the second category, and that the trademark protection should not be extended even to products as similar as beer and cordials.  *Id.* at 351.  Twenty years earlier the Seventh Circuit reached essentially the same result for the same reason.  *See Pabst Brewing Co. v. Decatur Brewing Co.*, 284 F. 110, 113 (7th Cir. 1922) ("In view of the very wide and general

-16-

employment of 'Blue Ribbon' as a trade-name, we believe the District Court properly concluded that appellant's right to use it was limited to [beer], and whatever other first use it made of it, and that in appellee's use of it [for malted liquor] there was no likelihood of any confusion of its product with that of appellant.").  The Second Circuit adopted this reasoning in a similar dispute soon thereafter. *France Milling Co. v. Washburn-Crosby Co.*, 7 F.2d 304, 306 (2d Cir. 1925) ("[O]ne who takes a phrase which is the commonplace of self-praise like 'Blue Ribbon' or 'Gold Medal' must be content with that special field which he labels with so undistinctive a name.").

The common use of a given trademark is still considered an important factor in considering the strength of a mark.  Thus, in *Petro Stopping*, the Fourth Circuit declined to extend the plaintiff's trademarks, PETRO STOPPING CENTER and PETRO TRAVEL PLAZA, which it used at its truck stops, to defendant's use of a PETRO CARD at its unmanned, self-service filling stations, in part because of the common usage of the term PETRO.  *Petro Stopping,* 130 F.3d at 94.  Furthermore, the strength of a commonly-used mark decreases as the number of third-party registrations increases.  *See Pizzeria Uno*, 747 F.2d at 1531 ("The greater the number of identical or more or less similar trade-marks already in use on different kinds of goods, the less is the likelihood of confusion.")(quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259-60 (5th Cir. 1980) (Seventy-two third party registrations of the appellant's DOMINO mark in the PTO makes the mark weak).

Dollar Tree has presented uncontroverted evidence that the RENAISSANCE mark is the subject of 465 federal and 203 state trademark registrations or pending applications, that there are 245 identifiable "common law trademarks" using the word "Renaissance," and that at least 2,925 businesses using the word RENAISSANCE in their business names.  Furthermore, including those

-17-

of RGC, there are 23 registrations for the mark RENAISSANCE in its class of paper products, including registrations for similar products such as wedding albums and labels. Whatever inherent distinctiveness the RENAISSANCE mark may have for distinguishing RGC's greeting cards is thus greatly diminished by the widespread use of the word in selling other products.[15]

While the conceptual strength of RGC's mark is greatly diminished by the common usage of the mark across a variety of markets, this does not end the strength of the mark analysis; it is also necessary to consider the commercial strength of the mark. *See, e.g., Petro Stopping*, 130 F.3d at 93 ("the placement of a mark in either the suggestive or descriptive category is merely the first step in assessing the strength of a mark for purposes of the likelihood of confusion test."). The commercial strength of a mark for purposes of the likelihood of confusion inquiry is related to, and therefore sometimes confused with, a mark's "secondary meaning" for purposes of the distinctiveness inquiry. *See, e.g., Petro Stopping*, 130 F.3d at 93. While the "secondary meaning" inquiry is relevant to a mark's validity, and the commercial strength of a mark inquiry is relevant to the likelihood of confusion, both inquiries involve similar analysis with both

---

[15] RGC correctly points out that it has addressed this problem by attempting to police the use of the RENAISSANCE mark in adjacent markets. Just as the widespread prevalence of the mark diminishes its distinctiveness, so "the successful policing of a mark adds to its strength to the extent that it prevents weakening of the mark's distinctiveness in the relevant market." McCarthy on Trademarks § 11:91 (quoting *Morningside Group, Ltd. v. Morningside Capital Group, LLC*, 182 F.3d 133, 139 (2d Cir. 1999)). Yet, RGC's efforts in this respect have yielded mixed results. Its settlement agreement with Renaissance Mark, Inc. merely restricted the type of label that could be marketed under the name Renaissance. Similarly, its settlement agreement with Album X Corporation was merely an agreement that Album X would continue not to sell its albums bearing the RENAISSANCE mark in department stores. Finally, neither the voluntary abandonment, nor the cancellation of a registration under 15 U.S.C. § 1058, provide persuasive evidence of the strength of RGC's mark outside of the greeting card industry.

requiring evidence that the mark is generally associated with the product or products at issue.[16] Thus, the inquiry into a mark's commercial strength will mirror the inquiry that would be undertaken to determine whether the mark has secondary meaning.  Normally, the "secondary meaning" inquiry involves consideration of several factors, including, but not limited to: (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use.  *Perini Corp.* 915 F.2d at 125 (citing *Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir. 1985)).  Not surprisingly, many of the same factors have been considered as relevant to a determination of a mark's strength for purposes of the likelihood of confusion inquiry.  Thus, it is appropriate to consider the sales and advertising expenditures of the product or products bearing the trademark at issue relative to those of other trademarks in the market.[17]  Likewise, courts examining the strength of a plaintiff's mark consider the exposure of

---

[16] *See* McCarthy on Trademarks § 11:82 ("When determining the commercial or marketplace strength of a mark, the courts look to the same kind of evidence of real world recognition of the mark as is used to decide the presence or absence of secondary meaning to determine whether or not a non-inherently distinctive designation is or is not a valid mark."); *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 821 (9th Cir. 1980) ("Secondary meaning and likelihood of buyer confusion are separate but related determinations, the relationship rising from the same evidentiary findings. The stronger the evidence of secondary meaning, the stronger the mark, and the more likely is confusion.").

[17] *See* McCarthy on Trademarks § 11:83 ("While evidence of advertising and sales is relevant to prove the strength of a mark, standing alone without a context, such evidence may not be sufficient to prove that a mark is very strong.  That is, the trademark owner should put its sales and advertising figures in perspective by comparing them to the sales and advertising figures for similar products to show that this mark is used on a leading product in its category.") (citing *Fossil Inc. v. Fossil Group*, 49 U.S.P.Q.2d 1451, 1457 (T.T.A.B. 1998)).

the mark through independent media coverage,[18] survey evidence of customer perceptions of the mark,[19] and the frequency of attempts to plagiarize or imitate the mark.[20]

Consideration of these factors leads to the conclusion that while the RENAISSANCE mark may have some potential power to identify a source in the greeting card market, it is not a strong mark. RGC's sales average of roughly $12 million per year is minuscule in relation to the size of the overall greeting card industry of $7 billion per year.[21] Likewise, RGC's attempts to promote its mark through advertising have averaged less than $360,000 per year, and have been targeted primarily to the narrow set of wholesale customers that constitute its direct customer base. Further, RGC has provided no evidence that its mark has been the subject of independent media coverage, nor has RGC provided any survey evidence indicating that there is a strong association between its RENAISSANCE mark and the greeting cards it sells within the minds of the consuming public. Consideration of the mark's commercial weakness, in combination with the wide use of the term RENAISSANCE in other products, compels the conclusion that the

---

[18] *Lone Star*, 43 F.3d at 935 ("As a result of Plaintiff's efforts, its mark has been the subject of national and local media attention and has achieved a high level of recognition in the restaurant field, entitling the marks to broad legal protection.") (citing *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1248 (4th Cir. 1970)).

[19] *See Commerce Nat'l Ins. Serv., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 442 (3d Cir.2000) (customer surveys relevant because probative of strength of the mark).

[20] *See Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987) ("The plaintiff's symbol, standing alone, is a strong mark of the identity of the source. It has been widely used by the plaintiff and, as indicated above, has not infrequently been imitated.") (internal citations omitted).

[21] This is true even considering the fact that RGC's sales are made at the wholesale level and the $7 billion figure is for the retail market. It is undisputed that RGC's share of the retail market does not exceed 1%.

RENAISSANCE mark is a weak mark, such that its ability to identify the source of products does not extend beyond the greeting card market.

*(ii) The Similarity of the Two Marks*

The second factor's relevance to the likelihood of confusion is obvious: the closer the resemblance between the protected mark and the infringing mark, the more likely the prospect for confusion. *See Cable News Network, L.P. v. CNNews.com*, 177 F.Supp.2d 506, 519 (E.D.Va. 2001). In evaluating the similarity or dissimilarity of the parties' marks, the "marks need only be sufficiently similar in appearance, with greater weight given to the dominant or salient portions of the marks." *Lone Star*, 43 F.3d at 936. A comparison of the marks in Exhibit A reveals a greater or lesser degree of similarity depending on which marks are compared. For example, Dollar Tree #2 is in cursive script, is surrounded by a very ornate border set in an oval, and has a capital letter R which is especially large and ornate followed by lower case letters. In contrast, RGC #3 has no border, and its lettering is printed in outlined block letters of equivalent size. These marks are further distinguishable by the fact that one is accompanied by the words gift bags and the other is accompanied by the words greeting cards. These marks do appear quite different. A comparison of Dollar Tree #4 and RGC #2, however, reveals marks that, except for slight differences in the capital R and the capitalization of the remaining words, are nearly identical. It is clear that RGC has used RGC #2 and RGC #4 since 1996. It is also clear that the four Dollar Tree gift bags that form the basis for RGC's claims of actual confusion used either Dollar Tree #1 or #2. Since the use of these different Dollar Tree marks is not known for certain, it is assumed for summary judgment purposes that the marks of Dollar Tree most similar to RGC #2 and #4 are used in all other instances, and that, therefore, the marks are similar in appearance.

-21-

*(iii) The Similarity of the Goods/Services the Marks Identify*

When the infringing goods are not identical to the goods sold under the trademark, they may still be entitled to protection if they are sufficiently related to cause consumers to believe they derive from the same source. *See Communications Satellite Corp. v. Comcet, Inc.,* 429 F.2d 1245, 1252 (4th Cir. 1970) ("When, as here, the parties are not competitors, the issue of infringement hinges on the likelihood of confusion about the source or sponsorship of the defendant's goods and services."). This record reflects that greeting cards are sometimes sold under the same mark as gift bags and gift wrap. For example, the market leader in gift cards, Hallmark, markets both greeting cards and gift bags under its well-known trademark. Indeed, RGC briefly marketed gift bags and gift wrap under the RENAISSANCE mark in the 1980s. RGC also contends that the goods are not merely similar, but also related, and that "complementary products, or services, are particularly vulnerable to confusion." *Communications Satellite*, 429 F.2d at 1253 (remarking that a reasonable consumer would believe that communications computers and communications services derive from the same source); *see also, Aunt Jemima Mills Co. v. Rigney & Co.*, 247 F. 407, 410 (2d Cir. 1917) (pancake syrup and pancake mix); *Valmor Products Co. v. Standard Products Corp.*, 464 F.2d 200, 203 (1st Cir. 1972) (haircare products and hair dryers and curling sets).

RGC also points to a recent decision of the Trademark Trial and Appeal Board holding that greeting cards and gift products are related. *National Football League v. Jasper Alliance Corp.*, 16 USPQ 2d 1212, 1216 (TTAB 1990). There the Board held that the applicant's attempt to register the SUPER BOWL trademark on greeting cards was likely to confuse consumers to conclude that the greeting cards came from the National Football League, who used its SUPER

BOWL trademark on posters, post cards, napkins, paper plates, paper party goods, and streamers.

*Id.* In reaching this result, the Board stated that:

> It is our view in this case, that the sale of greeting cards would naturally flow from previous sales of paper goods such as posters, post cards, wrapping and paper party goods and that potential purchasers would be quite likely to believe that greeting cards and paper goods such as those marketed by opposer's licensees would emanate from the same source. We therefore conclude that the sale of these goods under the same or a similar mark would be likely to lead to confusion, mistake or deception.

*Id.* Thus, when a mark is sufficiently strong, it will preclude its use in not only directly competitive products, but closely related ones as well.

The fact that a junior user's good is related to that of the senior user, is not, however, sufficient by itself to overcome an otherwise weak mark. Thus, in *Arrow Distilleries*, the Fourth Circuit concluded that the use of the mark ARROW, "even in the related fields of beers and cordials, [would not suffice to] indicate a common origin or endanger the reputation of the plaintiff's goods." *Arrow Distilleries,* 117 F.2d at 351. Similarly, in *Petro Stopping*, the Fourth Circuit found that the plaintiff's PETRO mark was not infringed despite the fact that the defendant sold fuel under the mark, one of the services provided by plaintiff. *Petro Stopping*, 130 F.3d at 95. Indeed, McCarthy's on Trademarks is replete with examples of similar or identical trademarks for related goods found to be non-infringing.[22] Thus, though the products

---

[22] *See* McCarthy on Trademarks § 24:62 (citing *Allstate Ins. Co. v. Allstate Inv. Corp.*, 210 F.Supp. 25, 28 (W.D.La. 1962) (No infringement between plaintiff's use of ALLSTATE mark in insurance industry and defendant's use in mortgage brokerage); *American Optical Corp. v. American Olean Tile Co.*, 185 U.S.P.Q. 405, 409-10 (S.D.N.Y. 1974) (no infringement of plaintiff's mark of AO for anti-skid floor coating by defendant's use of AO for ceramic tile products); *IDV North America, Inc. v. S & M Brands, Inc.*, 26 F. Supp. 2d 815, 824 (E.D.Va. 1998) (BAILEY's low priced cigarettes are not an infringement of BAILEY's liqueurs such as BAILEY's IRISH CREAM); *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 966 (2d Cir. 1981) (No infringement of plaintiff's mark for BRAVOS used on crackers by defendant's use of

are related, and therefore this factor weighs in favor of a finding of infringement, this factor alone is not dispositive.

*(iv) The Similarity of the Facilities the Two Parties Use in their Business*

The likelihood of confusion may also be increased if both goods are sold in the same channels of trade.  *See* McCarthy on Trademarks § 24.51; *see also Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 316-17 (S.D.N.Y. 2000) (no likelihood of confusion between high-fashion conscious, high income consumers in upscale specialty stores and casual clothing marketed to young, urban males in inexpensive retail outlets in urban neighborhoods). The relevant inquiry under this factor is whether the goods are sold to the same class of consumers in the same context.  *See* McCarthy on Trademarks § 24.51.

RGC markets its greeting cards to its wholesale customers who ultimately sell them in various types of retail establishments, including: florists, pharmacies, hospital gift shops, grocery stores, card and gift shops, and other retail outlets.  Dollar Tree markets its gift bags and wrapping paper exclusively in its discount retail stores.  Thus, while both parties market generally to the retail market, Dollar Tree's products are likely to be concentrated among value-conscious consumers.

The context in which RGC's greeting cards and Dollar Tree's gift bags and other

---

BRAVOS on tortilla chips despite virtually identical marks and close relation of products); *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1562-63 (S.D.N.Y. 1987) (defendant's use of NOTORIOUS mark for its perfume does not infringe plaintiff's mark of NOTORIOUS used for women's clothing and shoes); *Riva Boats Int'l S.p.a. v. Yamaha Motor Corp.*, 223 U.S.P.Q. 183 (C.D.Cal. 1983) (defendant's use of RIVA on motor scooters does not infringe plaintiff's right to use RIVA mark on luxury boats because plaintiff's mark is weak); *Knaack Mfg. Co. v. Rally Accessories, Inc.*, 955 F.Supp. 991, 1004 (plaintiff's WEATHERGUARD mark used in line of tool boxes and truck and van equipment not infringed by defendant's use of WEATHERGUARD mark for semi-fitted car covers)).

products are purchased is similar, as evidenced by the fact that Dollar Tree does sell greeting cards in its stores.  And, while Dollar Tree does not sell RGC's greeting cards, it is not required that the goods be sold side by side to find a likelihood of confusion under this factor.  *See Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 877 (Fed. Cir. 1992) ("An opposer does not have the burden to show sales of an infringing product by a specific chain of supermarkets or agents.").  Greeting cards, gift bags, gift wrap and related items are all purchased in a similar retail context that is characterized by relatively quick purchasing decisions based on a comparison of the available items.  Thus, the channels of trade, while not identical, are similar enough to weigh here very modestly in favor of infringement.

*(v) The Similarity of the Advertising Used by the Two Parties*

Similarities in the manner of advertising the products may also increase the likelihood of confusion.  *See Sara Lee*, 81 F.3d at 466.  On the other hand, evidence of dissimilarity between the methods of advertising diminishes the likelihood of confusion.  *See IDV North America, Inc. v. S&M Brands, Inc.*, 26 F.Supp.2d 815, 828 (1998).  In this case, there is absolutely no overlap in the advertising of the two brands.  Dollar Tree does not advertise its gift bags and wrapping paper and RGC advertisements are directed almost exclusively towards its wholesale customer base, and not to the ultimate consumers of the products.  Accordingly, because of the minimal advertising of both parties, this factor militates against a likelihood of confusion.

*(vi) The Defendant's Intent*

Also, probative of the likelihood of confusion is the putative infringer's intent in adopting the allegedly infringing mark.  The Fourth Circuit put this point as follows: "If there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one

intending to profit from another's reputation generally attempts to make his signs,

advertisements, etc., to resemble the other's so as to deliberately induce confusion." *Pizzeria*

*Uno*, 747 F.2d at 1535.   In other words, a junior user's intent to confuse consumers is probative

of the likelihood that it has succeeded in confusing consumers.   As the Ninth Circuit has

explained:

> [W]hen the evidence does show or require the inference that another's name was
> adopted deliberately with a view to obtain some advantage from the good will,
> good name, and good trade which another has built up, then the inference of
> likelihood of confusion is readily drawn, for the very act of the adopter has
> indicated that he expects confusion and resultant profit. . . . If such an intent is
> shown, it raises a presumption that deception and confusion resulted.

*Fleischman Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 158 (9th Cir. 1963) (internal

citations and quotation marks omitted).

The record here reflects that Dollar Tree had no knowledge of RGC's RENAISSANCE

marks when it began using a similar mark on its gift bags in the early 1990s, and did not learn of

RGC's trademark until just prior to the commencement of this lawsuit.   Even so, RGC contends

that Dollar Tree's failure to conduct a trademark search prior to marketing its gift bags under the

RENAISSANCE mark in 1993 should weigh against it.   *See, e.g., One World Botanicals Ltd. v.*

*Gulf Coast Nutrionals, Inc.*, 987 F.Supp. 317, 335 (D.N.J. 1997).   This argument misunderstands

the value of this factor as probative of likelihood of confusion.   If Dollar Tree had no knowledge

of RGC's mark, it could not have intended to confuse the public.   At most, the failure to conduct

a search is probative of Dollar Tree's carelessness, which even if true, has little bearing on the

likelihood that its allegedly infringing mark will confuse the public.   *See* McCarthy on

Trademarks § 23:109 ("[T]he existence of constructive notice is not evidence that a later user

necessarily intended to confuse.").

Furthermore, the fact that Dollar Tree did not cease marketing its gift bags with the RENAISSANCE mark immediately upon receipt of RGC's letter is not probative of bad faith. *See* McCarthy § 23:120 ("[A]fter a warning from plaintiff, defendant's attempt in good faith to obtain a judicial determination of trademark rights should be no indication of evil intent or bad faith."). Dollar Tree correctly contends that it had a reasonable basis to continue to market its gift bags under the RENAISSANCE mark because it had a good faith belief that RGC's mark is not strong enough to preclude others from using the RENAISSANCE mark for related goods. Given this, Dollar Tree's continued use of the mark on its paper products, and its pursuit of a judicial determination of this dispute is not evidence of bad faith, nor is it probative of the likelihood of confusion. Therefore, because Dollar Tree did not intend to confuse consumers, this factor weighs in favor of a finding of no infringement.

*(vii) Actual Confusion*

Evidence of actual confusion may in certain circumstances be compelling evidence of the likelihood of confusion. *See Lone Star*, 43 F.3d at 937. The record reflects four separate instances of actual confusion as to the source of a Dollar Tree gift bag that possessed the RENAISSANCE mark. Significantly, every instance of confusion was reported either by a wholesale customer of RGC, or, in one instance, a sales representative of RGC. It stands to reason that actual confusion among wholesale purchasers of RGC's greeting cards is more likely, given their greater familiarity with the mark due to personal interaction with RGC's sales force and the more significant wholesale purchasing decisions they have made. Likewise, the sales representative is more likely to associate the RENAISSANCE mark with RGC because part of

-27-

her income is derived from selling the product.  RGC presents no instances of confusion among the ultimate consumers of the greeting cards, the relevant market for the likelihood of confusion inquiry, and therefore RGC's examples of actual confusion are not very compelling.

Indeed, the fact that only four instances of actual confusion have been discovered during the more than ten years that the products were marketed simultaneously actually supports a finding of no likelihood of confusion. *See Petro Stopping*, 130 F.3d at 88 ("[T]he company's failure to uncover more than a few instances of actual confusion creates a 'presumption against likelihood of confusion in the future.'") (quoting *Amstar Corp. v. Dominos Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980)); *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 224 (3rd Cir. 2005) (listing as one of the factors for determining likelihood of confusion "the length of time the defendant has used the mark without evidence of actual confusion.").  The de minimis nature of RGC's evidence of actual confusion is only highlighted by the fact that it made significant efforts to uncover instances of actual confusion.  Since the commencement of this litigation RGC has twice asked its sales force to solicit instances of actual confusion from its wholesale customers.  Despite this effort, RGC has only been able to come up with these isolated instances of confusion by people more familiar with its brand than the ultimate consumer.  This stands in stark contrast to situations in which the Fourth Circuit has found actual confusion as an important factor. *See Resorts of Pinehurst*, 148 F.3d at 422-23 (reporting 15 misplaced calls each week, and other evidence of actual confusion); *Lone Star*, 43 F.3d at 927 (relating numerous unsolicited instances of customers being confused about the existence of any relation between the two restaurants).

In sum, given the length of time over which the parties' products were simultaneously

sold, the lack of any evidence of actual confusion among the retail market, and the efforts made by RGC to uncover evidence of actual confusion, this factor does not weigh in favor of a finding of a likelihood confusion.  As the Third Circuit has explained: "Ownership of a trademark does not guarantee total absence of confusion in the marketplace. Selection of a [common mark] naturally entails a risk of some uncertainty and the law will not assure absolute protection." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir. 1978).  *See also*, McCarthy on Trademarks § 23:13 ("The existence of some evidence of instances of actual confusion does not necessarily prevent the grant of a summary judgment of dismissal for lack of a triable issue of likelihood of confusion.  A court may find evidence of actual confusion insufficient to present a triable issue of fact where evidence in rebuttal provides a reasonable explanation discounting isolated instances of confusion.") (citing *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244 (8th Cir. 1990); *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576 (2d Cir. 1991)).

## IV.

In the end, the question to be decided in this dispute is whether the strength of RGC's RENAISSANCE mark to identify a source for greeting cards is sufficient to spill over beyond the scope of greeting cards to related product markets.  When making this determination, the issue is whether the RENAISSANCE mark can be used on related but distinct products "without creating the belief that both spring from a common source." *Arrow Distilleries*, 117 F.2d at 349.  Some marks are so well-known and so closely associated with a single source or producer that they are entitled to protection not only in those markets in which they are used, but also in those markets in which consumers might likely expect them to be used.  On the other hand, those marks which are neither well-known in the marketplace, nor evocative of a single producer, warrant narrower

-29-

protection restricted to the products for which the mark is registered.

While the record indicates that greeting cards are related to gift bags, gift wrap and the other paper products sold by Dollar Tree under the Renaissance name, RGC has not provided any evidence that its mark is strong enough to warrant the conclusion by the preponderance of the evidence that consumers of these related products are likely to be confused as to source.  The common and frequent use of the RENAISSANCE mark in many industries and businesses, coupled with RGC's de minimis share of the retail market and paltry advertising efforts, compels the conclusion that RGC's mark is too weak to have created any likelihood of confusion among consumers of Dollar Tree's paper products bearing a similar mark.  Indeed, the record reflects no evidence retail consumers' recognition of RGC's mark, a prerequisite to any confusion with the RENAISSANCE marks used by Dollar Tree.  RGC's only evidence of actual confusion, despite the more than ten years over which the products were marketed under similar marks, were four instances of confusion by wholesale customers and a sales representative.  These few incidents do not warrant a conclusion that there was a likelihood of confusion created by Dollar Tree's use of the RENAISSANCE mark on its paper products.  Nor does the other evidence presented by the record make it more likely that consumers will confuse the source of the product. The rough similarity of the marks and the retail distribution of both products weighs in favor of a finding of likelihood of confusion, but the lack of any overlap in advertising, and the absence of any evidence of Dollar Tree's intent to confuse weighs in favor of a finding of no likelihood of confusion.  In the end, consideration of the weakness of RGC's mark leaves no doubt that RGC's RENAISSANCE mark belongs to the class of trademarks entitled to protection only in the product market for which the registration issued.  Summary judgment for Dollar Tree is therefore

appropriate.  An appropriate order will issue.


/S/

Alexandria, VA                                    T.S. Ellis, III
December 19, 2005                                 United States District Judge

## DOLLAR TREE'S MARK



1



2



3



4



5

## RGC'S MARK

RENAISSANCE

1

Renaissance

2

RENAISSANCE
Greeting Cards

3

Renaissance
Greeting Cards

4



EXHIBIT

A